The only part of the charge of his Honor to which the plaintiff excepts, is that wherein he instructed the jury, if they should find that the appropriate business of the slave in question was to attend to the carts, and the overseer had given the order for those thus employed to get out of the way, and the others had done so, but that Calvin, against his general order, and without his knowledge, had taken the place of one of the hands engaged in blasting, and in consequence thereof was killed, their verdict should be for the defendants. The counsel for the plaintiff contends that this part of the charge was erroneous; for that the instruction should have been, that under the circumstances of the case, the conduct of the defendants' agent was rash, and evinced, a reckless disregard of danger; that he ought not to have permitted Calvin to be present when the blast was made, and that by permitting his presence, he had not taken that degree of care of him which the law requires; and that, consequently, the defendants (his employers) were liable for the loss of the slave.
If the testimony of the plaintiff's witness, Parker, had been the only evidence in the cause, we concede that there would have been made out a plain case of the want of ordinary care, and the defendants would have been responsible; and so his Honor very properly instructed the jury. But the testimony of the defendant's witness, White, presented the case in a different aspect, and it was to that, the instruction complained of was directed; and it is our duty to say whether, in reference to that, it was erroneous. Now, it will be borne in mind that, with regard to the finding of the jury upon the comparative reliance to be placed upon the statements of the respective witnesses, we have nothing to do. It was their province alone, unassisted by an intimation, even from the presiding Judge, to determine which account of the transaction — that given by Parker, or that given by White — was to be taken as the true one. The office of the Judge was confined to the duty of *Page 406 
informing the jury what was the law applicable to the case in the different views in which it was presented by the testimony. In the absence of a prayer for any more special instructions, we think his Honor did all that duty required, when he charged that, upon one state of facts, which we see was that testified to by the witness, Parker, the defendants were liable for the loss of the slave, but upon another state of facts, which we also see was sworn to by the witness, White, the defendants were not, in law, responsible for such loss. Whether the latter instruction was erroneous is the only question which we have to consider. The testimony of White is, that he was the overseer of the hands when the fatal blast was made; that it was then not quite dark, but deep dusk; that it was not the business of the slave, Calvin, to make blasts, but to dump carts; that before the matches were applied, he gave orders in a voice loud enough to be heard by all the other hands, for them to leave, and that he always gave such orders on such occasions; that he did not see Calvin at the drills, and that he did not know that he was there; and that he saw four negroes only, there, on that occasion. In considering his Honor's charge, with reference to this testimony, we should take to be true the statement of the witness, Parker, that, during the preceding year, the slave, Calvin, notwithstanding the general order of the overseer, White, to the contrary, did sometimes assist in blasting, without rebuke from him; that on the occasion when the slave was killed, he took the place of one of the negroes, whose business it was to make blasts, that it was too dark to see falling stones, and that he had run off after the matches were applied, and had gone to the distance of about one hundred and fifty yards, when he was killed by a large fragment of falling stone. This occurred on the last Monday of February, 1854, it being the first occasion on which blasts were made that year. The slave, Calvin, was hired by the defendants to work on the rail road, and his proper business was that of dumping carts. The defendant had the right, therefore, to set him to work at the place where the blasting was done, and the only ground of complaint which *Page 407 
can be made, is that he was permitted to take the place of one of the blasting hands, and to assist in setting fire to the matches. The enquiry is narrowed down to this, then — was it the omission of ordinary care in the overseer not to have seen that Calvin was present, assisting in fixing off the blast? The counsel for the plaintiff contends that it was; and that he might have seen Calvin and ordered him away, had not the blast been made in the night. The witnesses differ some what in their statements as to the degree of darkness which then prevailed; but neither of them says it was too dark to see a man, or to distinguish one man from another, though it was too dark to see the falling stones. Mr. White says that he did see four men, (the proper number present,) but he did not observe that Calvin was one of them. Calvin had just before, as Mr. Parker says, changed places with Abner, one of the regular blasting hands. Was it a want of ordinary care in Mr. White, the overseer, not to have noticed the change? Mr. White had not ordered him to be there; on the contrary, he had just before, in a loud voice, told all except the regular hands, to leave. His indulgence in the previous year, to Calvin's propensity for the business of blasting, may lead us to believe, that if he had seen him, he would not have driven him away. He had, however, on that occasion, in a general order, told him to leave, and his only fault then, (if fault it was) was in not having seen Calvin change places within Abner. Was this an omission of ordinary care for Calvin's safety? Upon the best consideration which we are able to give to the subject, we are constrained to say, that we do not think it was. "Ordinary care, (say the Court, in Heathcock v. Pennington, 11 Ire. Rep. 640,) is that degree of it, which in the same circumstances, a person of ordinary prudence would take of the particular thing, were it his own." This definition does not fix a standard by which any thing like an approach to mathematical exactness and certainty can be attained. The very nature of the subject forbids it. What man can be selected as the model of ordinary prudence? What is ordinary prudence, as distinguished from that which is more or less *Page 408 
than ordinary? It is very nearly, if not quite impossible, for any one man to establish a certain and invariable standard for himself, much less for others. In such cases the law has given a rule, without affording us a certain guide, by which to follow it. Necessity requires some rule, and therefore, the law has prescribed one. The nature of the subject prevents an approach, in such rule, to more than moral certainty, and we must be content to follow it as best we can.
In the care which is to be taken of a slave, he is to be considered an intelligent being, with a strong instinct of self-preservation, and capable of using the proper means for keeping out of, or escaping from, scenes of danger. "Hence (say the Court in the above cited case of Heathcock v.Pennington,) the same constant oversight and control are not requisite for his preservation, as for that of a lifeless thing or an irrational animal." So, in the case of Herring v. Wilmington and Raleigh R. R. Company, 10 Ire. Rep. 402, the Court saying that, under the particular circumstances stated, the engineer of the rail-road cars would have been guilty of negligence running over a log of wood, or a cow, added: "But as the negroes were reasonable beings, endowed with intelligence as well as the instinct of self-preservation, and the power of locomotion, it was a natural and reasonable supposition, that they would get out of the way, and the engineer was not guilty of negligence, because he did not act upon the presumption that they had lost their faculties by being drunk, or asleep." Again, in the case of Swigent v. Graham, 7 B. Mon. (Ken.) Rep. 661, it is said that, a "slave, being capable of voluntary motion, of observation, experience, knowledge and skill, is presumed, in ordinary cases, to be capable of taking care of himself, if disposed to do so, without constant supervision or physical control."
Let us apply these principles, so well sustained by authority, to the case before us, and see what will be the result. We will admit that the blasts were the more dangerous by being in the night, and if Calvin had been one of the regular blasting hands, his owner might have complained of the overseer *Page 409 
for ordering him to do such work at such a time. But he was not ordered to be there. It was no part of his business to be there. On the contrary, his duty required him to be elsewhere. If there were greater danger from the falling stones then, than there would have been in the day time, his intelligence, and his instinct of self-preservation, ought to have kept him out of the way of harm. If the overseer had learnt by experience, that the slave would not obey his orders to leave in the day time, he had no reason to suppose that he would run needlessly into danger at night. The overseer, therefore, had nothing to arouse his suspicions, so as to keep him constantly on the alert, to prevent Calvin from changing places with one of the hands, whose duty it was to blast. We do not believe that a man of less than extreme prudence, would have deemed it necessary to make such lookout, for the purpose of stopping Calvin from intermeddling in business with which he had no concern. We think that Heathcock v. Pennington, presented a case quite as strong as the present, against the hirer of a slave for the application of the rule of ordinary care. We cannot decide against the defendants in the present case, without unsettling the standard set up, in the one to which we have alluded, by the unanimous opinion of the Court.